UNITED STATES COURTS
DISTRICT OF IDAHO

SEP     99

LODGED_____FILED_____

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PLANNED PARENTHOOD OF IDAHO, INC., and GLENN H. WEYHRICH, M.D., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| | ) ) |
| ALAN G. LANCE, Attorney General of the State of Idaho, and GREG BOWER, Ada County Prosecuting Attorney, | ) ) ) ) |
| Defendants. | ) ) ) |

CASE NO. CIV 00-0353-S-MHW

**MEMORANDUM OPINION AND ORDER**

The following motions are currently before the Court for its consideration: (1) Plaintiffs'

Motion for Preliminary Injunction (Docket # 7), filed June 26, 2000; and (2) Defendants' Motion

to Augment the Record to Include the Affidavit of Erika Gonzalez (Docket # 55), filed August

30, 2000. Parties submitted written consents to appear before a U.S. Magistrate Judge on June

28, 2000, and June 29, 2000. On July 6, 2000, the Court conducted a hearing on Plaintiffs'

Application for a Temporary Restraining Order (Docket # 6), filed June 26, 2000, with counsel

for all parties appearing and participating and issued a ruling from the bench granting relief. On

July 7, 2000, the Court granted Plaintiffs' Application for a Temporary Restraining Order.

Defendants filed their briefing addressing the Preliminary Injunction on August 9, 2000.

**Memorandum Opinion and Order – page 1**



Plaintiffs filed their reply briefing on August 11, 2000. Defendants moved in limine to bar Plaintiffs from offering certain opinion testimony at the August 16, 2000, hearing. On August 14, 2000, the Court conducted a hearing on Defendants' Motion in Limine Regarding Plaintiffs' Experts (Docket # 29), with counsel for all parties appearing and participating and issued a ruling from the bench denying Defendants' Motion. On August 16, 2000, the Court conducted a hearing on Plaintiffs' Motion for Preliminary Injunction and received exhibits and heard live and deposition testimony from various witnesses and one party.

On August 18, 2000, through counsel, the Idaho Family Defense Fund, Inc., and the Idaho Chooses Life Alliance, Inc., filed a Petition for Leave to Appear as *Amicus Curiae* and to File a Memorandum (Docket # 46) in support of Defendants' opposition to Plaintiffs' request for a preliminary injunction. The Court will grant the request to appear *amicus*, with certain qualifications that will be discussed at the conclusion of this memorandum. On August 30, 2000, the Defendants filed a Motion to Augment the record with the affidavit of Erika Gonzalez (Docket # 55). As discussed below, the Court will deny the motion.

## I.

## SUMMARY.

For the reasons that will be discussed in more detail in the Court's Memorandum Opinion, Plaintiffs' Motion for a Preliminary Injunction pending trial, to restrain the enforcement, operation and execution of 2000 Senate Bill No. 1299, amending Chapter 6, Title 18 of the Idaho Code to add new sections 18-609A and 18-614, will be granted in part and denied in part, as follows:

.      1.      Idaho Code § 18-614, requiring certain forms of identification for all women seeking abortion services, will be preliminarily enjoined.

**Memorandum Opinion and Order – page 2**

2.      Idaho Code §§ 18-605 and 18-606, providing criminal felony sanctions for any person who performs an unlawful abortion or is an accessory or an accomplice to such an abortion will be preliminarily enjoined, but only to the extent that the criminal prosecution would originate out of a medical emergency as defined in Idaho Code § 18-609A(5)(c) and Idaho Code § 18-609A(1)(a)(v).

3.      Idaho Code § 18-609A(b)(i), the first sentence only, which states that "[t]he petition shall be filed in the judicial district where the minor resides," will be preliminarily enjoined.

The other provisions of 2000 Senate Bill No. 1299 will not be preliminarily enjoined and the Court further finds that these three provisions are severable from the other portions of the Act. After hearing additional evidence and legal arguments, the Court will determine if the preliminary injunction now entered as to these three provisions will be made permanent and whether Plaintiffs are entitled to any further declaratory judgment and injunctive relief with respect to other portions of the Act.

## II.

## Background.

Plaintiffs in this case are Planned Parenthood of Idaho, Inc. (hereinafter "Planned Parenthood") and Glenn H. Weyhrich, M.D. (hereinafter "Dr. Weyhrich"). Planned Parenthood is a not-for-profit organization located in Boise, Idaho, which provides medical and educational services to women and men. Planned Parenthood services include pregnancy diagnosis and counseling, contraceptive counseling, provision of all methods of birth control, HIV/AIDS testing, etc. Planned Parenthood does not perform abortion services, but provides its patients with referrals to providers of those services.

Plaintiff Dr. Weyhrich is a physician licensed to practice medicine in the State of Idaho, and is a board-certified obstetrician and gynecologist who maintains a private ob/gyn practice in Boise. Dr. Weyhrich provides an array of medical services, including abortions. Among Dr. Weyhrich's patients seeking abortions are minors. Dr. Weyhrich also serves as the volunteer medical director of the clinic operated by Planned Parenthood and supervises the nurse practitioners who work in the clinic.

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to enjoin the enforcement of 2000 Idaho Senate Bill No. 1299 (hereafter "the Act"). *See* Idaho Code § 18-601 et seq. This new law requires a woman to show "positive identification" before obtaining an abortion and provides alternate methods by which a minor may obtain "consent" to be allowed to have an abortion. The Act became effective July 1, 2000.

Plaintiffs challenge the constitutionality of the Act on primarily three grounds. First, Plaintiffs argue that the Act violates the rights of Plaintiffs' patients as guaranteed by the Fourteenth Amendment to the United States Constitution by requiring every woman, before she can obtain an abortion, to present "positive identification." Plaintiffs contend that this process will increase the health risks and costs associated with abortion by forcing women to delay terminating their pregnancies.

Second, Plaintiffs argue that the Act violates the rights of Plaintiffs' minor patients as guaranteed by the Fourteenth Amendment of the United States Constitution by requiring that a physician obtain parental consent before performing an abortion on the minor without providing an adequate mechanism to bypass the consent requirement. Plaintiffs argue that the bypass is inadequate because it contains a restrictive venue provision directing that the bypass petition be

filed in the judicial district where the minor resides, allows the time in which the matter is to be decided by the trial court to be extended for good cause, and does not affirmatively advise the minor of her right to an attorney or provide that an attorney must be appointed for the minor.

Third, Plaintiffs assert that the medical emergency provisions of the Act further violate the due process rights of Plaintiffs' minor patients by requiring post-procedure notification of a parent without providing an adequate judicial bypass procedure to waive that notification. Plaintiffs contend that this will deter minors who need emergency abortions from seeking them. Plaintiffs also argue that the medical emergency provision imposes criminal liability on a physician based on an objective standard without providing adequate notice as to what conduct is proscribed by the Act.

### III.

### Legal Standard.

Federal courts have authority to grant a preliminary injunction under Federal Rule of Civil Procedure 65. Fed. R. Civ. P. 65(a) discusses the procedure to be followed in an application for a preliminary injunction. Broadly defined, a preliminary injunction is a judicial remedy that is issued to protect a plaintiff from irreparable harm while preserving the court's power to render a meaningful decision after a trial on the merits. Thus, a preliminary injunction may issue even though a plaintiff's right to permanent injunctive relief is not certain. The grant or denial of a preliminary injunction is a matter of the court's discretion exercised in conjunction with the principles of equity. *See Inland Steel v. U.S.*, 306 U.S. 153, 59 S. Ct. 415, 83 L.Ed. 557 (1939); *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 61 S. Ct. 229, 85 L.Ed. 189 (1940); and *Stanley v. Univ. of Southern California*, 13 F.3d 1313 (9th Cir. 1994).

While courts are given considerable discretion in deciding whether a preliminary injunction should enter, and injunctive relief is not obtained as a matter of right, it is also considered to be an extraordinary remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion. *See Sampson v. Murray*, 415 U.S. 61, 94 S. Ct. 937, 39 L.Ed.2d 166 (1974*); Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co.*, 363 U.S. 528, 80 S. Ct. 1326, 4 L.Ed.2d 1435 (1960); and *Stanley v. Univ. of Southern California*, 13 F.3d 1313 (9th Cir. 1994).

In the case of *Martin v. International Olympic Committee*, 740 F.2d 670, 674-75 (9th Cir. 1984), the Ninth Circuit set forth the legal standard for a district court to apply in exercising its discretion as follows:

> In this circuit, a party seeking preliminary injunctive relief must meet one of two tests. Under the first, a court may issue a preliminary injunction if it finds that: (1) the [moving party] will suffer irreparable harm if injunctive relief is not granted, (2) the [moving party] will probably prevail on the merits, (3) in balancing the equities, the [non-moving] party will not be harmed more than [the moving party] is helped by the injunction, and (4) granting the injunction is in the public interest.

*Id.* (internal quotations and citations omitted); and *Stanley*, 13 F.3d at 1319 (9th Cir. 1994). The factors have been further distilled to a requirement that the movant show either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits are raised and the balance of hardships tips sharply in plaintiff's favor. *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999); *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999). These two alternatives represent "extremes of a single continuum," rather than two separate tests. *See id.* Therefore, the greater the probability of success, the less hardship to the plaintiff must be shown. *See id.*

## IV.

## Discussion.

### A.    Applicable law on minor's abortion rights and parental involvement.

Various cases from the United States Supreme Court have discussed the right of a minor

to seek an abortion, the important role of parents in that decision making process and the valid

interest of the various states in regulating abortions through legislation.  Generally the legislation

falls into two categories, statutes that require parental consent and those that discuss parental

notification.  The Act in question primarily involves the former.

In *Planned Parenthood v. Danforth*, 428 U.S. 52, 74, 96 S. Ct. 2831, 2843, 49 L.Ed.2d

788, 808 (1976), the Supreme Court found that minors are persons who "possess constitutional

rights" and addressed for the first time the constitutionality of a state statue that contained

mandatory parental consent provisions, and rejected the part of a state law that prohibited

unmarried minors from procuring an abortion without a parent's consent.

But *Danforth* did not stand for the proposition that a state cannot legitimately impose

limitations on a minor's right to have an abortion that might otherwise constitute an

unconstitutional undue burden on an adult woman's right to terminate a pregnancy.  In *Bellotti v.*

*Baird*, 443 U.S. 622, 99 S. Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion) ("*Bellotti II*"), the

Supreme Court stated:

> As immature minors often lack the ability to make fully informed choices
> that take account of both immediate and long-range consequences, a state
> reasonably may determine that parental consultation often is desirable and in the
> best interest of the minor.  It may further determine, as a general proposition, that
> such consultation is particularly desirable with respect to the abortion decision –
> one that for some people raises profound moral and religious concerns.

*Id.* at 640.

**Memorandum Opinion and Order – page 7**

As a result, the *Bellotti II* court found that if a state wanted unmarried minors to obtain

consent from their parents, the state also had to provide an alternate process (often referred to as

"judicial bypass") in which a minor could obtain a waiver by demonstrating either that she is

sufficiently mature to make the decision on her own with her physician, or that an abortion is in

her best interest.  Justice Powell stated that the process must guarantee anonymity and occur

expeditiously so that the minor has a opportunity to proceed with the abortion in a safe and

timely manner if the state court agrees she can make her own decision or it is in her best interest.

In fact, the Supreme Court approved a Missouri parental consent statute that contained an

adequate judicial bypass procedure.  *Planned Parenthood Ass'n v. Ashcroft*, 462 U.S. 476, 103 S.

Ct. 2517, 76 L.Ed.2d 733 (1983).

More recently, the Supreme Court upheld a Pennsylvania statute requiring one parent's

consent before a physician can perform an abortion on a minor, but the statute also established a

constitutionally adequate bypass procedure which allowed the minor to self-consent to the

abortion if she was sufficiently mature to make that decision.  *See Planned Parenthood v. Casey*,

505 U.S. 833, 112 S. Ct. 2791, 120 L.Ed.2d 674 (1992).  The Pennsylvania statute also allowed

the judge to find that the abortion was in the best interest of the minor.  *Id.*  The decision in

*Casey* is of far greater import than its discussion of the Pennsylvania parental consent provisions

because *Casey* truly changed the legal landscape and formulated a new legal test that would

henceforth be applied to the emotional and contentious field of abortion law.

In *Casey*, the Supreme Court held that an abortion law is unconstitutional on its face if,

"in a large fraction of the cases in which [the statute] is relevant, it will operate as a substantial

obstacle to a woman's choice to undergo an abortion."  *Id.* at 877.  Such laws constitute an

**Memorandum Opinion and Order – page 8**

"undue burden" on a woman's right to have an abortion, reaching "into the heart of the liberty protected by the Due Process Clause." *Id.* at 874. The Supreme Court determined that the trimester framework endorsed in earlier decisions was not constitutionally required. As the Court stated:

> The trimester framework no doubt was erected to ensure that the woman's right to choose not become so subordinate to the State's interest in promoting fetal life that her choice exists in theory but not in fact. We do not agree, however, that the trimester approach is necessary to accomplish this objective. A framework of this rigidity was unnecessary and in its later interpretation sometimes contradicted the State's permissible exercise of its power.
>
> Though the woman has a right to choose to terminate or continue her pregnancy before viability, it does not at all follow that the State is prohibited from taking steps to ensure that this choice is thoughtful and informed. Even in the earliest stages of pregnancy, the State may enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term and that there are procedures and institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself.

*Id.* at 872.

The Ninth Circuit has stressed that *Casey's* undue burden standard is to be applied in determining the facial constitutionality of abortion statutes. *See Planned Parenthood v. Lawall*, 180 F.3d 1022, 1027 (9th Cir. 1999). Thus, the Court will examine the arguments of both parties and determine whether Plaintiffs have a strong likelihood of success on the merits as to whether 2000 Idaho Senate Bill No. 1299 creates a substantial obstacle and therefore an undue burden on a minor's right to have an abortion, and whether the breadth of the positive identification requirement on all women seeking an abortion is constitutionally infirm.

### 1.    Positive Identification.

The Act requires that before performing an abortion, a physician confirm the age

of the woman by positive identification or secure legal consent pursuant to Section 18-609A,

Idaho Code.  *See* Idaho Code § 18-614(1) (2000).  This provision applies to all women seeking

abortions; a minor, however, may "bypass" the positive identification requirement by filing a

petition with the court where she could make a showing that she is either mature enough to make

her own decision or the judge can find it is in her best interest.  The only way to bypass the

identification requirement is by following the procedures set forth in Section 18-609A, and on its

face it applies only to minors.[1]

The Act then identifies several acceptable forms of positive identification, including a

certified copy of the individual's birth certificate, the individual's passport or any driver's

license, or an identification or military card if they include a photo of the individual and the

individual's date of birth.  *See* Idaho Code § 18-614(2).

Plaintiffs argue that the positive identification requirement is a substantial undue burden

on women seeking an abortion and is therefore unconstitutional.  Specifically, Plaintiffs point to

the requirement's impact on adult women.  Plaintiffs note that the Act provides no exceptions for

adult women who are unable to satisfy the positive identification requirement.  Plaintiffs also

contend that not all women who seek abortions in Idaho have one of the forms of positive

identification required by the Act and those who do not would be required to obtain one prior to

getting an abortion regardless of their age.  Plaintiffs assert that obtaining one of these forms of

---

[1] Defendants have argued that an adult woman without positive identification could also avail herself of
Section 18-609A and go before a judge and establish she is over 18.  However, such a procedure for adult women is
not discussed in the statute and it is not the function of this Court to create new statutory provisions where none
exist.

identification would likely involve a substantial delay of several months for certain minority groups within Idaho, particularly for those individuals born in foreign countries.

At the hearing, Elena Rodriguez testified that the Act would place a substantial obstacle in the path of adult women who would seek an abortion under the Act. Ms. Rodriguez currently serves as the Farm Workers Services Coordinator for Terry Reilly Health Services and has been with this organization for 10 years. Terry Reilly is a non-profit organization that operates seven community and migrant health centers in southwestern Idaho. Prior to living in Idaho, Ms. Rodriguez worked in Colorado with a public health center that provided similar services, including providing care to migrant farm workers. For six years, Ms. Rodriguez did case management work for Terry Reilly where she would monitor the health of pregnant women from the time of their pregnancy until their children were born and immunized. If a patient decided to terminate her pregnancy, Ms. Rodriguez would assist in a referral to an abortion provider and then do follow up care for a few weeks. Because of her linguistic abilities, Ms. Rodriguez case load was comprised solely of Hispanic women whose only language was Spanish. Ms. Rodriguez testified that, based on her 35 years of experience dealing with Hispanic women in Colorado and Idaho, she had become familiar with their personal lives and experiences.

Terry Reilly's annual report lists the number of patients treated, which is further subdivided into the number of Hispanic patients, which is additionally subdivided into migrant or seasonal farm workers. Ms. Rodriguez testified that 3000 patients seen by the clinics in 1999 were migrant or seasonal farm workers. Ms. Rodriguez also testified that she estimated that ninety percent of this group, or 2700 patients, were "undocumented," meaning they were aliens born outside of the United States without any available identification.

The Court allowed this testimony over the objection of Defendants that this testimony was speculative, based on hearsay and could not be considered an expert opinion as to whether these individuals did or did not have identification. Defendants accurately point out that Ms. Rodriguez never asked her patients whether they had a driver's license, a government issued identification card, a passport or other approved identification acceptable under the statute. To the extent there was no survey based on any accepted scientific methodology, Defendants argue that Ms. Rodriguez's opinions on the number of migrant or seasonal farm workers that do not possess any approved identification would not be admissible under the Federal Rules of Evidence 702.

Plaintiffs argue that the Court should find that Ms. Rodriguez's opinions are reliable based on her years of experience dealing with migrant farm workers, particularly at the preliminary injunction stage of these proceedings where Plaintiffs only have to show a likelihood of success on the merits.

For purposes of ruling on the motion for a preliminary injunction, the Court finds that Ms. Rodriguez's testimony and opinions are sufficiently reliable. In many ways, her testimony is similar to the testimony by a government agent who was allowed to testify in a criminal trial about the characteristics of gang cultures based on his years of experience. As the Ninth Circuit stated:

> [The Defendant] mistakenly implies that the court should have assessed this
> testimony in the same way that the district court reviewed the methodology used
> by the tire defect expert in *Kumho Tire*. However, far from requiring trial judges
> to mechanically apply the *Daubert* factors — or something like them — to both
> scientific and non-scientific testimony, *Kumho Tire* heavily emphasizes that
> judges are entitled to broad discretion when discharging this gatekeeping function
> . . . . The Daubert factors (peer review, publication, potential error rate, etc.)
> simply are not applicable to this kind of testimony, whose reliability depends

heavily on the knowledge and experience of the expert, rather than the methodology of the theory behind it.

*United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000).

In addition to her knowledge based on experience, Ms. Rodriguez's testimony was based on actual case histories. Ms. Rodriguez testified that on several occasions she had assisted migrant farm workers who were submitting applications for Medicaid reimbursements, and that these applications required identification similar to that required by the Act. Her patients were simply unable to produce any identification. Also, Ms. Rodriguez stated that the clinics were prohibited by their grants and other laws and regulations from asking for identification since they were required to deliver their services in a non-discriminatory manner and that this was the reason she did not ask to see someone's driver's license, so any type of formal survey as to the percentage of migrant farm workers who did not possess identification would not be possible.

Defendants argue that Plaintiffs have not come forward with an undocumented woman to testify that she does not have the identification described in the statute or confirming Ms. Rodriguez's testimony that it would take a substantial amount of time to obtain records from her home country.

At the preliminary injunction stage of these proceedings, the Court finds the evidence presented by Ms. Rodriguez to be reliable to the extent that it establishes that a majority of Hispanic women who are migrant and seasonal farm workers do not have the identification required by the statute. This is not to say that the evidence Plaintiffs have presented to date will necessarily sustain their burden of proof at the trial. The Court expects that each side will conduct whatever discovery is appropriate and be able to refer to concrete examples, verifiable tests, or studies on the amount of time it would take to obtain appropriate identification in order

**Memorandum Opinion and Order – page 13**

to determine if a substantial delay would be involved.[2]

A group of women have now been identified as having difficulties obtaining the identification required by the statute. The next task is to apply the legal test set forth in *Casey* and determine whether the statute affects a "large fraction" of those who might seek an abortion.

Ms. Rodriguez testified that in a typical year when she was a case manager she would see approximately 300-350 patients. Of that group, approximately 50 desired to terminate their pregnancies with an abortion. A few of these would have the pregnancy test and leave the state for the abortion, while a majority would have the services performed in Idaho. Ms. Rodriguez personally followed up on 25-30 of her patients who did have abortions. She could not recall any that would have had the approved form of identification or who could have obtained it in time to safely have the procedure performed. Does this number constitute a large fraction of the cases to which the identification restriction would apply?

At this juncture, the Court must turn to the *Casey* decision to determine what exactly is meant by this legal test and how it is to be applied. The Supreme Court has stated that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*, 505 U.S. at 894. The threshold question before this Court, then, is whether the Act will operate as a substantial obstacle to a woman's choice to undergo an abortion in a large fraction of cases in which the Act is relevant. *See Planned*

---

[2] Both *amicus* and the Defendants have sought to augment the record with the affidavit of Erika Gonzalez , which provided an example of the amount of time it took to obtain her birth certificate from Mexico. The affiant, however, has not been subject cross-examination by the Plaintiffs. The Court will deny the motion to augment. The Court has already indicated that this is an important issue that needs to be developed through discovery and presented at the trial. The Court does not find that it is in the public interest to continue to delay resolution of the motion for a preliminary injunction by allowing the case to be developed in a piece-meal fashion, which then delays implementation of other portions of the Act.

*Parenthood v. Lawall*, 180 F.3d 1022, 1025 (9th Cir. 1999), amended by 193 F.3d 1042 (9th Cir. 1999).

Defendants suggest that since the identification restriction applies to all women who seek an abortion, this category is significantly larger than the small percentage of Hispanic women who do not have identification.  Therefore, the restriction does not apply to a large fraction of all women who seek an abortion in Idaho.  In other words, the vast majority of women in Idaho either have one of the approved forms of identification, or lacking identification, will not face a substantial obstacle to having an abortion because they can obtain an approved form of identification within a few days.  Plaintiffs respond that this is precisely the argument rejected by the Supreme Court in *Casey.*

At issue in *Casey* was that portion of the Pennsylvania statute which required that a married woman provide notification to her husband that she was about to undergo an abortion. The statute had exceptions to the notification requirement, such as if a woman would certify to her physician that her husband was not the father of the child, that her husband could not be located, or that the notification would result in physical harm to herself.  There was also an exception for medical emergencies.  The state of Pennsylvania attempted to avoid the conclusion that this section was invalid by pointing out that it imposed almost no burden at all for the vast majority of married women seeking abortions since their husbands were involved in the decision. This is very similar to the argument made by Defendants in this case, which is evident when the two arguments are juxtaposed.

Pennsylvania noted that only twenty percent of the women who obtained abortions were married.  Reports from the Bureau of Vital Records and Health and Statistics for the state of

**Memorandum Opinion and Order – page 15**

Idaho reflect that 888 abortions were performed in Idaho in 1998, and, of that total, 102 were obtained by Hispanic women, or eleven percent.

Pennsylvania next argued that ninety-five percent of the married women voluntarily notified their husbands of their intentions. Thus, only one percent of the women seeking an abortion would be affected by the notification requirement. Defendants in this case argue that 16 of the 102 Hispanic women were known to be minors and would have to either have a parent consent or go through judicial bypass under Idaho Code § 18-609A. Defendants state that the group would then be reduced to 86 Hispanic women. Defendants then remove from this group the 17 women who reported that they were married, which reduced the group to 69. This was based on the assumption that all of these women could establish by written documentation that they were married, presumably with a marriage license.

This is the first flaw in this analysis, assuming the logic of Defendants' argument. Initially, it must be recognized that all of these women self-reported that they were married. There is no evidence in the record that any marriage licenses were ever presented as proof of a women's marital status under the old law. The testimony of Ms. Rodriguez is that women in the Latino culture consider themselves married if they are living with a man, without having gone through a religious or civil ceremony, and presumably this is what they would have reported to their physician. In Ms. Rodriguez's experience, migrant farm and seasonal workers did not have marriage licenses in their possession. Obtaining a marriage license from a foreign country in a few days would constitute a substantial obstacle and create an undue burden on Hispanic women. So, rather than excluding the 17 married women who might have an alternate method of escaping the identification requirement, perhaps some or all of that number should be added back in. The

Court recognizes, however, that some of these individuals were probably United States citizens whose marriages were performed in the United States, who likely already have some form of approved identification aside from a marriage license.

Defendants then seek to remove, from their ever dwindling group, thirty-six Hispanic women who were over 25 years of age.  Defendants' argument for excluding this group is that older women could go before a state court judge for the judicial bypass of the identification requirement in much the same manner as a mature minor who wished to self-consent.  The problem, as identified earlier, is that there is no such procedure established by the Idaho legislature nor is it the function of this Court to create Idaho law.

Following Defendants' argument, the Court would probably be justified in stopping with the number of unmarried Hispanic women who sought abortions in 1998, or 83, and then subtracting sixteen minors from that group for a total of 67.  As discussed previously, the Court could rationally add back to that number some percentage of Hispanic women who self-reported they were married, but had never been formally married, and therefore could not produce a marriage license, or who were married in a foreign county.  For purposes of this analysis, however, the Court will exclude all married women.

Solely referencing the 67 adult unmarried Hispanic women, the positive identification requirement (assuming ninety percent would not have identification) would affect approximately 60 Hispanic women, or .067 percent of the total number of women (888), regardless of age or nationality, who sought abortions in 1998.  This number is slightly less than the one percent of the women Pennsylvania argued were affected by the husband notification statute.

**Memorandum Opinion and Order – page 17**

As pointed out by Plaintiffs, however, this type of analysis misses the mark. What must be done under *Casey* is to look at the group that will be affected by the restriction, not those for whom the restriction will be "irrelevant." As the Supreme Court stated:

> The analysis does not end with the one percent of women upon whom the statue operates; it begins there. Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. For example, we would not say that a law which requires a newspaper to print a candidate's reply to an unfavorable editorial is valid on its face because most newspapers would adopt the policy even absent the law. The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.
>
> Respondents' argument itself gives implicit recognition to this principle, at one of its critical points. Respondents speak of the one per cent of women seeking abortions who are married and would choose not to notify their husbands of their plans. By selecting as the controlling class women who wish to obtain abortions, rather than all women or all pregnant women, respondents in effect concede that § 3209 must be judged by reference to those for whom it is an actual rather an irrelevant restriction. Of course, as we have said, § 3209's real target is narrower even than the class of women seeking abortions identified by the State: it is married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement. The unfortunate yet persisting conditions we document above will mean that in a large fraction of the cases in which § 3209 is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion. It is an undue burden, and therefore invalid.

*Id.* at 894-95 (citations omitted).

This long citation to the *Casey* decision is necessary to point out the underlying fallacy of Defendants' arguments. Although Idaho's identification restriction applies to all pregnant women seeking an abortion, it will be irrelevant to the vast majority of women because they already have the identification required by the statute or will be able to obtain satisfactory identification in a day or two. For these women, the burden is either minuscule or nonexistent. The identification restriction will only be relevant to the group of women who do not have the approved identification (or marriage license) and who cannot obtain it within the time necessary

**Memorandum Opinion and Order – page 18**

to have the abortion performed in a timely manner.

The Court will assume (even though not supported by the testimony) that every married Hispanic woman can readily produce a marriage license and show she is emancipated. Again, to this subgroup, the restriction would be irrelevant. However, looking at 1998 and the 83 unmarried Hispanic women, and removing the 16 self-reported minors, of the remaining 67 adult women who sought abortions in 1998, ninety percent of these women, or 60 adult women, could not obtain the state-approved identification in a timely manner. This group would constitute fifty-nine percent of all Hispanic women, regardless of age or marital status, who sought abortions in 1998. The Court finds that when the identification restriction is applied to those to whom it is truly relevant, a "large fraction" of women seeking an abortion will be affected. Further, the Court finds, for purposes of the preliminary injunction analysis, that the positive identification provision is a substantial and real restriction, and that it would constitute an undue burden and therefore fails the *Casey* test.

While not controlling, the Court finds some significance to the fact that, out of thirty-nine other states which have parental consent statutes, not one of them has enacted a positive identification requirement applicable to all women.[3] Further, the Court agrees with Plaintiffs that not all women who seek abortions in Idaho have one of the forms of positive identification required by the Act and those who do not would be required to obtain one prior to getting an abortion regardless of age. Imposing this requirement on an adult women would be a violation of the constitutional standards laid out in *Planned Parenthood v. Casey*, 505 U.S. 833 (1992).

---

[3] *See* Plaintiffs' Reply to Defendants' Opposition to Preliminary Injunction (Docket # 39) at 7 & nn. 5-7.

**Memorandum Opinion and Order – page 19**

Accordingly, the Court finds that Plaintiffs have raised serious questions going to the merits and the balance of hardships tips sharply in Plaintiffs' favor.

### 2.      The Judicial Bypass to Parental Consent.

Minors, as well as adults, have a right to choose abortion. *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S. Ct. 2831, 49 L.Ed.2d 788 (1976).  The Supreme Court has held that if a state decides to require a pregnant minor to obtain one or both parents' consent to an abortion, the state also must provide an alternative procedure under which authorization for the abortion can be obtained.  *See Planned Parenthood v. Lawall*, 180 F.3d 1022, 1027 (9th Cir. 1999) (citing *Bellotti v. Baird*, 443 U.S. 622, 643, 99 S. Ct. 3035, 61 L.Ed.2d 797 (1979)).  The waiver must be granted if the minor can convince the finder of fact either that she is mature enough to decide about an abortion on her own or that the proposed abortion would be in her best interest.  *See Ohio v. Akron Ctr. for Reprod. Health, II*, 497 U.S. 502, 511, 110 S. Ct. 2972, 111 L.Ed. 2d 405 (1990); *Lawall*, 180 F.3d at 1027-28.

Plaintiffs argue that the Act is unconstitutional because it fails to provide an adequate bypass to parental consent.  Defendants disagree with Plaintiffs' characterization of the Act and argue that the judicial bypass procedure which Idaho has enacted has repeatedly been sustained as constitutional.  Due to the many facets of this issue, the Court will separately address the venue restriction, a minor's right to legal counsel, and the bypass procedure's time frame, respectively.

### a.      The Act's Venue Restriction.

The Act requires that a minor seeking judicial bypass of the parental consent requirement file her petition in the judicial district where she resides.  *See* Idaho Code

§ 18-609A(1)(b)(i).  Plaintiffs argue that, under the Act, a minor who was a non-resident and wanted an abortion in Idaho would be unable to satisfy the venue requirement and would have no choice other than to seek parental consent.  In addition, with respect to resident minors, Plaintiffs assert that the venue provision does not provide the minor with the flexibility she needs to preserve her confidentiality.  Plaintiffs contend that minors living in rural communities will risk being seen by friends, neighbors, and relatives if forced to travel to the nearest courthouse.  Thus, Plaintiffs assert that the Act's venue restriction would prevent minors from seeking a bypass.

Defendants contend that this provision only mentions residents, not non-residents; therefore, it does not apply to non-residents seeking an abortion in Idaho.  Defendants also argue that venue is not jurisdictional and that a non-resident minor could file a petition in any county.  As for confidentiality, Defendants assert that the geographic logistics of Idaho's seven judicial districts provide multiple options to any young woman to assure that she can distance her case from her home area.

Again, while not necessarily controlling, the Court finds some significance to the fact that of the twenty-nine parental involvement laws in effect that contain bypass procedures, twenty-eight have a venue provision that provides that venue is proper for minors where they live and also where the abortion provider is located.[4]  Further, twenty-two states allow a minor to file her petition anywhere in the state.[5]

Defendants were unable to identify any state interest in their written briefing which would support the state's interest in a restrictive venue statute.  During oral argument, counsel for

---

[4] *See* Plaintiffs' Reply to Defendants' Opposition to Preliminary Injunction (Docket # 39), filed August 11, 2000, at 11, n.10.

[5] *See id.* at 11, n.11.

**Memorandum Opinion and Order – page 21**

Defendants argued that the judicial districts for Idaho had the same county boundaries as did the central health districts and that this in some manner equated to a state's interest in the health of a minor who might have an abortion. Only three counties in Idaho have abortion providers. It is hard for the Court to understand why a minor having an abortion in Ada County, who had been allowed to file her petition there, even though she actually resides at the opposite end of the state in Boundary County, would somehow have her health placed in jeopardy vis-a-vis her county central health providers because she filed in Ada County.

Perhaps Defendants can further articulate their concerns at the trial on the merits. At this stage of the proceedings, the Court finds that minors need to have considerable flexibility in seeking access to their state court system in a convenient manner. *See Indiana Planned Parenthood Affiliates Assoc. Inc. v. Pearson*, 716 F.2d 1127, 1142 (7th Cir. 1983).

Plaintiffs have shown that the venue requirements limit their access to the state trial courts in the following manner. In 1998, sixty minors who resided in Canyon County had abortions (some of these may have had the abortions performed out-of-state). Since there are no abortion providers in Canyon County, some percentage of the 60 minors who did have the abortion performed in Idaho presumably traveled a short distance to Boise for their procedures. However, under the new statute, minors residing in Nampa, Canyon County, could no longer travel to Boise, Ada County, where Dr. Weyhrich has his practice, to file the petition and have an abortion because Nampa is in the Third Judicial District and Boise is in the Fourth Judicial District. Therefore, a minor living in Nampa who does not want to go to the local Canyon County courthouse would have to travel to another courthouse in the Third Judicial District, such as the Owyhee County courthouse in Murphy or to the Gem County courthouse in Emmett, both

a considerable distance from Nampa, when this same minor is twenty minutes from Boise and the Ada County Courthouse. These are real life situations that raise serious questions about the restrictive venue requirements.

At this stage of the proceedings, Plaintiffs have raised serious questions going to the merits and the balance of hardships tips sharply in favor of Plaintiffs. The portion of Idaho Code § 18-609A (b)(i), which states that "The petition shall be filed in the judicial district where the minor resides," will be preliminarily enjoined.[6] Minors, including out-of-state minors, would then have access to any district court in the state of Idaho.

b.     **A Minor's Right to Legal Counsel**

Plaintiffs contest that the Act's judicial bypass procedure fails to guarantee minors an "effective opportunity" to seek a judicial bypass because they are not advised of their right to legal counsel. The Act states that "if so desired by the minor," she can request that the Court appoint a guardian ad litem, or in the alternative, if no guardian ad litem is requested, the court should consider whether appointment of a guardian ad litem is appropriate. There is no affirmative obligation imposed by the statute on the court to require the court to advise the minor that she has a right to counsel, appointed or retained, to assist her in: (1) preparing the petition, (2) marshaling and presenting her evidence to meet the clear and convincing standard required by

---

[6] The Court has considered the testimony of Fourth District Judge Daniel T. Eismann, who serves as the Administrative District Judge for the Fourth Judicial District, Ada County, State of Idaho. Judge Eismann testified that, in his view, certain portions of the Idaho Constitution prohibit the Legislature from restricting the jurisdiction of the state courts. Judge Eismann also testified that he would hear a petition even if it were filed by a minor from another judicial district. He further testified that he could transfer the petition to the appropriate judicial district. He also stated that his view of venue had not been discussed with other trial judges in the Fourth Judicial District. These uncertainties raise serious questions at this stage and Defendants have not directed the Court to binding legislative or case authority on this issue. However, by enjoining the provision that creates the restrictive venue, this Court would reach the same result as opined by Judge Eismann. Therefore any district court in the state of Idaho would have venue and jurisdiction to consider a petition by a minor.

the statute, or (3) presenting her appeal in the event the petition is denied.

If the minor requests a guardian ad litem, or if the court finds that one is appropriate, then the statute provides that the guardian ad litem, whether prospective or appointed, must be an attorney properly licensed in the state of Idaho. But if no qualified guardian ad litem is available, the statute then states that the minor is to be given assistance by the court in preparing the petition and that the court can appoint some other person to act in the capacity of a guardian ad litem, who shall fulfill the purposes of the statute. *See* Idaho Code § 18-609A(1)(b)(i), (iii). Plaintiffs assert that these provisions do not sufficiently protect a minor's rights to have legal counsel represent her interests in a bypass proceeding.

Defendants assert that the Act does recognize the limitation of a minor in understanding the judicial process, and therefore provides for assistance and appointment of a guardian ad litem. However, Defendants argue that no absolute right to assistance in such a situation has ever been articulated.

This is a tough issue to resolve at this stage of the proceedings. Neither party has cited to any circuit authority directly on point that states a minor has a constitutional right to the appointment of counsel.[7] Perhaps a more appropriate question is whether there is a constitutional right to be *advised* of the right to counsel, retained or otherwise, at a judicial bypass proceeding since important constitutional rights are involved. The Court fully recognizes that most minors do not have the resources to hire an attorney, but if they were advised of their right to legal

---

[7] Both parties have cited the decision of *Planned Parenthood v. Neely*, 804 F.Supp. 1210, 1217 (D.Ariz. 1992) where the court stated that, "Although a minor woman does not have a constitutional right to representation of counsel at a judicial bypass proceeding, the requirement that a woman waive court appointed counsel knowingly and intelligently, demonstrates the Supreme Court's acknowledgment that the young woman should be made aware of the implications of self-representation."

**Memorandum Opinion and Order – page 24**

counsel they could seek assistance from the *pro bono* section of the Idaho State Bar.

As to this argument, the Court does not find at this stage of the proceedings that Plaintiffs have shown through citation to legal authority that there is a constitutional right to appointment of counsel over and above what is provided for in the Idaho statutory scheme. Plaintiffs may have stronger factual and legal arguments to present at the trial on the merits, at least to establish that the statute should require that a minor be *affirmatively* advised that she has a right to legal representation (perhaps not appointed counsel) and/or that she has a right to appointment of a legal guardian (which would normally be an attorney) without her first requesting one. In the end, this may be an easy burden to carry.

### c.    The Bypass Procedure's Time Frame.

The Act requires that a hearing be held no later than five days from the filing of the petition and that an order shall be entered no later than five days after the conclusion of the hearing. *See* Idaho Code § 18-609A(1)(b)(iii),(iv). However, Plaintiffs note that a court "may enlarge the times set forth pursuant to this subsection upon the request of the minor or upon other good cause appearing." *See* § 18-609A(1)(d). Plaintiffs assert that without a definition of "good cause" or a finite time limit in which a petition must be finally adjudged, the bypass procedure fails to guarantee expediency. *See Glick v. McKay*, 937 F.2d 434, 440-41 (9th Cir. 1991), *overruled on other grounds by Lambert v. Wicklund*, 520 U.S. 292, 117 S. Ct. 1169, 137 L.Ed.2d 464 (1997) (parental notice law with no specified time limit for court ruling on waiver petition is unconstitutional).

Defendants argue that Idaho's district courts are not only admonished that this proceeding will be expedited, but are mandated that a decision will be entered within ten days of the

**Memorandum Opinion and Order – page 25**

application.  Defendants contend that this time frame is substantially less than the statute

challenged in the case of *Ohio v. Akron Ctr. for Reprod. Health, II*, 497 U.S. 502 (1990) ("*Akron*

*II*"), which was likely to result in up to a 22-day delay and was held constitutional.  While the

Act does provide for an expansion of that time when good cause is shown, Defendants argue that

any such decision will be based on the best interest of the minor.

In *Bellotti v. Baird*, 443 U.S. 622, 99 S. Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality)

("*Bellotti II*"), the Supreme Court held that if a state decides to require a pregnant minor to obtain

one or both parents' consent to an abortion, the state also must provide an alternative procedure

under which authorization for the abortion can be obtained.  *See id.* at 643.  In subsequent cases,

the Court has repeatedly affirmed *Bellotti II*'s holding.  *See Lambert v. Wicklund*, 520 U.S. 292,

295, 117 S. Ct. 1169, 137 L.Ed.2d 464 (1997); *Akron II* , 497 U.S. at 510; *Hodgson v.*

*Minnesota*, 497 U.S. 417, 461, 110 S. Ct. 2926, 111 L.Ed.2d 344 (1990) (plurality opinion);

*Planned Parenthood Ass'n v. Ashcroft*, 462 U.S. 476, 491 n. 16, 103 S. Ct. 2517, 76 L.Ed.2d 733

(1983).

For a judicial bypass provision to avoid fatal vagueness under *Bellotti II*, the trial court's

review of a minor's application must be performed within specific, determinate time limits.  "[A

bypass provision] must assure that a resolution of the issue, and any appeals that may follow, will

be completed with . . . sufficient expedition to provide an effective opportunity for an abortion to

be obtained." *Bellotti II*, 443 U.S. at 644.  As the Ninth Circuit has stated:

> Because time is such a critical factor, relating both to a woman's health and the
> exercise of her constitutional right to an abortion, the bypass procedure, which
> does not contain a time period within which the state district court must rule on a
> minor's petition and thus may delay her right to implement the bypass procedure,
> possibly indefinitely, does not sufficiently protect a pregnant minor's
> constitutional right to an abortion.

Memorandum Opinion and Order – page 26

*Glick*, 937 F.2d at 442.

The Act contains specific time frames which can only be expanded at the minor's request or for good cause. The fact that under some remote set of circumstances good cause may be found to continue a hearing for a short period of time does not render the statute unconstitutional. Fourth District Judge Daniel Eismann, with years of experience, had extreme difficulty even conjuring up a set of hypothetical circumstances which might constitute good cause. Taken as a whole, the procedures for a judicial bypass provide an appropriate constitutional framework for expedited judicial resolution of any petitions. The Court trusts that a trial court will use discretion when and if it expands time periods for the bypass when good cause is shown. Accordingly, the Court finds that the Act's judicial bypass provision meets the *Bellotti II* expediency criterion.

### 3.     Medical Emergency Exception.

Women, including minors subject to a parental consent or notice requirement, are entitled to an emergency abortion to protect their health. *See Casey*, 505 U.S. at 880. "Statutes regulating abortions must permit doctors to perform immediate abortion when necessary to avert significant health risks to the woman." *Lawall*, 180 F.3d at 1033 (citing *Casey*, 505 U.S. at 880).

Plaintiffs contend that the Act's medical emergency exception to the requirement that a physician receive legal consent prior to performing an abortion is too restrictive and unconstitutional. Plaintiffs point to the specific language that the woman's condition must be "sudden and unexpected." *See* Idaho Code § 18-609A(5)(c)(i). Plaintiffs argue that a woman with a chronic medical condition, such as kidney or heart disease, would not meet the definition of "medical emergency" because the physical condition was neither "sudden or unexpected."

**Memorandum Opinion and Order – page 27**

Plaintiffs also argue that the Act fails to provide an adequate bypass of parental notification after an emergency abortion. The Act allows a bypass of this notification only if the physician reasonably believes that the minor is abandoned or homeless or that her physical safety would be jeopardized by parental notification. *See* Idaho Code § 18-609A(1)(a)(v). Plaintiffs thus contend that the Act penalizes a minor who needs an emergency abortion because notification of her parent would be required even if she would have been able to bypass the parental consent requirement had she not faced the emergency. Moreover, Plaintiffs assert that the Act will "chill" minors' exercise of their rights in the situation in which they need it most – when their health is threatened.

Finally, Plaintiffs argue that the objective standard and vague terminology of the Act's Medical Emergency provisions violate the Due Process rights of physicians such as Dr. Glenn H. Weyhrich. The Act requires that the medical emergency be a condition that "in the reasonable medical judgment of any ordinarily prudent physician acting under the circumstances and conditions then existing" necessitates the abortion. *See* Idaho Code § 18-609A(5)(c)(i). Plaintiffs assert that by imposing this objective standard, the Act subjects the physician's conduct to the second guessing of juries and perhaps prosecutors (as a violation of the Act carries criminal penalties). Therefore, with the possibility of serious criminal penalties attached to the Act, Plaintiffs maintain that the physician's willingness to provide life or health-saving medical procedures will be chilled.

Defendants argue that the medical emergency provision is more than adequate. Defendants also contend that the provisions stating when a medical emergency exists are clear. Furthermore, Defendants insist that such a determination is one that physicians make regularly

**Memorandum Opinion and Order – page 28**

and would be based on what a reasonable physician would do under like circumstances.

As for post emergency abortion notification, Defendants point to the presumed immaturity of a minor. Defendants assert that while an adult has the maturity and capability to understand the serious nature of the surgery and takes steps to assure that follow up care is appropriate, minors do not. Defendants contend that the Act provides for the involvement of an adult in the decision and necessities that follow such a procedure. Therefore, Defendants argue that notification provides the minor with the same rights as an adult in the same circumstances. The Court will separately address each of these points.

<strong>a.    Definition of medical emergency.</strong>

The Act's medical emergency exception defines "medical emergency" as a sudden and unexpected physical condition, which is abnormal and so complicates the medical condition of the minor so as to necessitate the immediate causing or performing of an abortion to prevent the minor's death or to eliminate a serious risk of immediate, substantial and irreversible impairment of a major bodily function. Idaho Code § 18-609A(5)(c). This language is very similar to the language approved in *Casey*, where the Supreme Court scrutinized a Pennsylvania statute which defined the term "medical emergency" as "[t]hat condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of major bodily function." *Casey*, 505 U.S. at 977-78.

There is, of course, a major difference between the objective physician standard in the Idaho statute and the good faith clinical judgment afforded to a physician in the Pennsylvania

statute, but that will be discussed later. At this stage of the proceedings, the Court is convinced

that the language used will provide an adequate standard to guide a physician in making a

decision that what he or she is about to undertake would be an emergency abortion as defined by

the statute. The statutory language does have the two touchstones required by the Supreme

Court, that a medical emergency abortion both address situations when it is needed to prevent the

death of the mother and when it is necessary to protect her health.

 Dr. Weyhrich testified that he was concerned that there could be confusion about what

was meant by the terms, "sudden" and "unexpected." As an example, if a patient had a

preexisting health condition that could create complications with a pregnancy, and if the patient

developed these complications at a later point and an abortion was then necessary, would that be

"sudden" or "unexpected." The Court interprets these terms to include the situation described by

Dr. Weyhrich. As an example, many diabetic women become pregnant and proceed with a

pregnancy to birth without the need for an emergency abortion. If a diabetic woman needed an

emergency abortion, the Court gathers from Dr. Weyhrich's testimony that it would be rare, and

would therefore constitute a sudden and abnormal situation in the context of a "normal"

pregnancy for a diabetic woman. Unfortunately the record is not fully developed on this point

and additional expert testimony will clarify this issue at trial. In the meantime, the Court can

address the primary concern expressed by Dr. Weyhrich that others may interpret what is

"sudden" or "unexpected" differently and thereby subject physicians to criminal prosecution

since an objective-physician standard is contained in the statute.

### b. Criminal Liability for Performing Emergency Abortions.

 Per § 18-605 of the Act, an Idaho physician who was adjudged to have

not acted in a medical emergency situation as an "ordinarily prudent physician" arguably would have committed a felony and would face between two and five years in prison. The Seventh Circuit, in *Karlin v. Foust*, 188 F.3d 446 (7th Cir. 1999), stated that it was a Wisconsin statute's lack of criminal liability that made the statute's objective standard acceptable. *See id.* at 467 (providing that the provision in question merely imposed a monetary fine for violations, not a "risk of incarceration" nor a label on the violator "with the stigma of having been convicted of a misdemeanor or felony offense"). Additionally, in *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 205 (6th Cir. 1997), the Sixth Circuit stated that "[t]he objective standard combined with strict liability for even good faith determinations, could have a profound chilling effect on the willingness of physicians to perform abortions."

After careful reflection, the Court finds that Plaintiffs have raised a serious question going to the merits and the balance of hardships tips strongly in Plaintiffs' favor. Therefore, the Court will enjoin any criminal prosecution of a physician who performs an abortion as defined in Idaho Code §§ 18-609A(5)(c) and 18-609A(1)(a)(v).[8]

> **c.      Lack of judicial bypass procedures following an emergency abortion.**

Plaintiffs argue that the emergency exception does not provide an adequate bypass procedure. Under the Act, a mature minor seeking a non-emergency abortion is able to employ the judicial bypass to have an abortion without parental *consent.* Conversely, a mature minor obtaining an emergency abortion who does not wish to have her parents notified must provide: 1) evidence of abuse, abandonment, homelessness, or proof that her physical safety will

---

[8] Under the former statute, the Idaho Attorney General issued an opinion stating that "it was not the intent of the legislature to impose criminal sanctions against a physician for noncompliance with this section." Op. Att'y Gen. following former Idaho Code § 18-609.

be jeopardized if a parent is notified; and 2) a petition as contemplated by the Child Protection Act in order to get a judicial bypass.

An important distinction to be made is that in non-emergency situations the Act provides an avenue to waive the requirement of the *consent* of one parent, under the theory that no one should be able to exercise a veto over a minor's decision. What is at issue in the emergency abortion is parental *notice* after the abortion. The Defendants have argued that in these situations parental notice is appropriate since the minor may have serious health consequences relating to the situation that gave rise to an emergency abortion. In addition, a bypass is set up in the statute for those minors that are homeless, abused, neglected or in danger if their parents were notified. What is left out of that mix is a mature minor, who does not fit one of those categories, who does not wish to have the parents notified.

The law in this area is far from clear. A recent decision cited by *amicus*, *Planned Parenthood of the Blue Ridge v. Camblos*, 155 F.3d 352 (4th Cir. 1998), upheld a parent notification statute which included exceptions for abusive or neglectful parents but did not otherwise include a notification bypass procedure option for mature minors. However there is language in *Bellotti II*, 443 U.S. at 649, which states that "every pregnant minor is entitled in the first instance to go directly to court for a judicial determination without prior parental notice, consultation, or consent." This might suggest that the Fourth Circuit is in error in its interpretation of the Constitutional requirements.

At this juncture, the Court cannot find that Plaintiffs have met their burden to have this portion of the Act preliminarily enjoined pending trial. Perhaps Plaintiffs can more fully develop what they believe was the rationale behind their contention that if the Act were to go into effect,

Idaho would be the only state requiring any sort of parental notice after an abortion performed due to a medical emergency, and it is therefore an unconstitutional burden.

## V.

### Severability of Individual Provisions of the Statute.

As Defendants correctly point out, the statute itself provides for the severability of any one or more of the provisions.  That provision reads:

> **18-615.  Severability.**  If any one (1) or more provision, section, subsection, sentence, clause, phrase, or word of this chapter or the application thereof to any person or circumstance is found to be unconstitutional, the same is hereby declared to be severable and the balance of this chapter shall remain effective notwithstanding such unconstitutionality.  The legislature hereby declares that it would have passed every section of this chapter and each provision, section, subsection, sentence, clause, phrase or word thereof irrespective of the fact that any one (1) or more provision, section, subsection, sentence, clause, phrase, or word be declared unconstitutional.

Defendants suggest that if any of the provisions of the Act should be enjoined, an appropriate method of injunction would be to only enjoin that portion of the Act subject to a question as to constitutionality.  The Court finds that the provisions that will be preliminarily enjoined are severable from the Act, and that the Act can function in a cohesive fashion pending trial on the merits.

## VI.

### Whether Attorney General Al Lance is Not a Proper Party to Name to Overcome the State's Eleventh Amendment Immunity.

Defendants contend that the Eleventh Amendment prohibits the issuance of a preliminary injunction against Attorney General Al Lance.  In support, Defendants assert that Attorney General Lance is not responsible to enforce the Act and he has not threatened to do so.

As Plaintiffs note in their Reply to Defendants' Opposition to Preliminary Injunction, this

same argument was tried without success before Judge Winmill in *Weyhrich v. Lance*, Case No. CV 98-0117-S-BLW.  For the reasons articulated in Judge Winmill's order, this argument is again rejected.

## VII.

### Motion to Intervene.

On August 18, 2000, Idaho Family Defense Fund, Inc., and Idaho Chooses Life Alliance, Inc., filed a Petition for Leave to Appear as *Amicus Curiae* and to File Memorandum (Docket # 46).  After thorough consideration of the content of the petition and Plaintiffs' Opposition to Idaho Family Defense Fund, Inc.'s Petition for Leave to Appear as Amicus Curiae (Docket # 54), the Court grants Idaho Family Defense Fund's petition.  Since a number of the factual matters submitted in the memorandum were not supported by affidavit, the Court focused on the legal arguments of the *Amicus*.  To the extent that the legal points and arguments assert facts, the Court relied on what has already been provided by Plaintiffs and Defendants.[9]

## VIII.

### Motion to Augment.

On August 30, 2000, Defendants filed a Motion to Augment the Record to Include the Affidavit of Erika Gonzalez (Docket # 55).  For the reasons stated herein, the motion will be denied.

---

[9]  This is due in large part to the fact that many of the arguments made in *Amicus'* Memorandum also overlapped the arguments already made by Defendants.

**Memorandum Opinion and Order – page 34**

# IX.

## Conclusion.

In conclusion, Plaintiffs' Motion for a Preliminary Injunction pending trial, to restrain the enforcement, operation and execution of 2000 Senate Bill No. 1299, amending Chapter 6, Title 18 of the Idaho Code to add new sections 18-609A and 18-614, will be granted in part and denied in part. Idaho Code § 18-614, requiring certain forms of identification for all women seeking abortion services, will be preliminarily enjoined. Idaho Code §§ 18-605 and 18-606 will be preliminarily enjoined, but only to the extent that the criminal prosecution would originate out of a medical emergency as defined in Idaho Code § 18-609A(5)(c) and Idaho Code § 18-609A(1)(a)(v). Idaho Code § 18-609A(b)(i), the first sentence only, which states that "The petition shall be filed in the judicial district where the minor resides," will be preliminarily enjoined. The Court finds that these provisions are severable from the other portions of the Act. Thus, the other provisions of 2000 Senate Bill No. 1299 will not be preliminarily enjoined. After hearing additional evidence and legal arguments, the Court will determine whether the preliminary injunction now entered will be made permanent and whether Plaintiffs are entitled to any further declaratory judgment or injunctive relief with respect to other portions of the Act.


///

///

///

## ORDER

Based upon the foregoing, the Court being fully advised in the premises, IT IS HEREBY

ORDERED that:

(1)     Plaintiffs' Motion for a Preliminary Injunction (Docket # 7), filed
        June 26, 2000 is GRANTED in part and DENIED in part; and

(2)     Idaho Family Defense Fund 's Petition for Leave to Appear as *Amicus
        Curiae* and to File Memorandum (Docket # 46), filed August 18, 2000,
        is GRANTED.

(3)     Defendants' Motion to Augment the Record to Include the Affidavit
        of Erika Gonzalez (Docket # 55), filed August 30, 2000, is DENIED.

DATED this _____ day of September, 2000.

MIKEL H. WILLIAMS
United States Magistrate Judge

**Memorandum Opinion and Order – page 36**

## MAILING CERTIFICATE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this _____ day of September, 2000, to the following:

B  NEWALL SQUYRES
HOLLAND & HART
P O  BOX 2527
BOISE  ID  83701

HELENE T  KRASNOFF
PLANNED PARENTHOOD
1120 CONNECTICUT AVE N W   STE 461
WASHINGTON   DC   20036

ROGER K  EVANS
PLANNED PARENTHOOD
810 SEVENTH AVE
NEW YORK   NY   10019

CLINTON E  MINOR
DAVID W  LLOYD
OFFICE OF THE ATTORNEY GENERAL
CIVIL LITIGATION DIVN
P O  BOX 83720
BOISE  ID  83720-0010

CARY COLAIANNI
ADA COUNTY PROSECUTOR'S OFFICE
650 MAIN ST
BOISE  ID  83702

WILLIAM T  SALI
PO BOX 71
KUNA, ID 83634

Cameron S. Burke, Clerk
United States District Court

_____
by Deputy Clerk

**Memorandum Opinion and Order – page 37**